

FILED
MIAMI COUNTY
COMMON PLEAS COURT

2017 JUN 21  PM 3: 11

JAN A. MOTTINGER
CLERK OF COURTS

MIAMI COUNTY COMMON PLEAS COURT
CIVIL DIVISION

JANICE L. WEADOCK          :
1325 Croydon Rd.           :
Troy, OH  45373            :
                           :
        Plaintiff,         :
                           :
    vs.                    :
                           :     CASE NO.  16-219
JAMAL TAHA, M.D.           :
31 Stanfield Rd.           :     JUDGE JEANNINE N. PRATT
Suite 104                  :
Troy, OH 45473             :
                           :
    and                    :     **<u>SECOND AMENDED COMPLAINT</u>**
                           :     **<u>JURY DEMAND ENDORSED</u>**
KETTERING HEALTH NETWORK a/k/a  :  **<u>HEREON</u>**
KETTERING HOSPITAL         :
3535 Southern Blvd #3000   :
Kettering, OH 45429-1221   :
                           :
    and                    :
                           :
GENESIS HEALTH CARE, LLC   :
512 Crescent Dr.           :
Troy, OH  45373-2718       :
                           :
    and                    :
                           :
MEDICARE                   :
Benefits Coordination and Recovery  :
Center                     :
P.O. Box 138897            :
Oklahoma City, OK 73113    :
                           :
        Defendants.        :
                           :
                           :

## PARTIES

1.    Plaintiff Janice L. Weadock ("Janice") is an individual who resides in the City of Troy, Miami County, Ohio.

2.    At all times relevant to this Complaint, Defendant Jamal Taha, M.D., ("Defendant Taha") was duly licensed to practice medicine by and in the State of Ohio.  Defendant Taha provides treatment for consideration to those in need of medical care.  Defendant Taha has offices located at 31 Stanfield Road, Suite 104, Troy, Miami County, Ohio and Kettering Hospital a/k/a Kettering Medical Center, a/k/a Kettering Health Network, Southern Boulevard, Kettering, Ohio.

3.    Defendant Kettering Hospital, a/k/a Kettering Medical Center, a/k/a Kettering Health Network ("Defendant Kettering"), located in Dayton, Montgomery County, Ohio, provides treatment, by and through its actual and ostensible agents and employees, to those in need of medical care.

4.    Defendant Genesis Health Care LLC ("Defendant Genesis") is a national nursing home rehabilitation facility with 500 locations in 34 states and located in Troy, Ohio at 512 Crescent Drive, Troy, Miami County, Ohio.

5.    Medicare is a program operated and funded by the Federal Government to pay for qualifying medical expenses incurred by citizens of the United States who meet government requirements.  Medicare may have made payments for medical expenses incurred by Janice for which Medicare may be entitled to reimbursement.

6.    Defendants John Doe #1 – 10, names and addresses unknown, were physicians, nurses, hospitals, corporations, or other entities that provided negligent medical or health care, individually or by and through their employees and/or agents, actual or ostensible, to Plaintiff

2

Janice. Plaintiff has been unable to identify the names and/or identities of Defendants John Doe

#1 - 10 through the exercise of reasonable diligence. Plaintiff reserves the right to substitute a

named Defendant for such John Doe(s) upon discovery of the name and/or identity of any such

individual(s) who may have fallen below the accepted standards of care.

## JURISDICTION AND VENUE

7.      This court has personal jurisdiction over Defendant Taha because, at all relevant

times, he was a resident of and did business in the State of Ohio.

8.      This court has personal jurisdiction over Defendant Kettering because at all

relevant times, it was a resident of the State of Ohio and did business in the State of Ohio.

9.      This court has personal jurisdiction over Defendant Genesis because at all

relevant times it was a resident of the State of Ohio and did business in the State of Ohio.

10.      Venue is proper because all or a part of the conduct which gave rise to Plaintiff's

action occurred in Troy, Miami County, Ohio.

11.      The instant case does not involve a substantial federal question, state law

preemption, or diversity between the parties.

## FACTUAL ALLEGATIONS

12.      Defendants Taha and Kettering, individually or by and through actual or

ostensible agents or employees, were professionally negligent and fell below the accepted

standards of medical care in that they failed to exercise the degree of care required of reasonably

skillful and prudent physicians, specialists, and/or other healthcare professionals under similar

circumstances by: (1) failing to provide Janice with timely and aggressive medical attention, and

failing to recommend and provide surgical revision of the malpositioned fusion cage; and (2)

3

abandoning Janice after June 6, 2015 and failing to provide any further medical care and treatment.

13.     Attached hereto and provided in accordance with Ohio Civil Rule 10(D)(2) requiring an affidavit of merit is the affidavit of Dr. Robert K. Eastlack a medical doctor licensed to practice medicine in the State of California, who specializes in orthopedic spine surgery and, who has: (1) reviewed all medical records, laboratory reports, imaging studies, reports and films reasonably available concerning the allegations contained in this Complaint; (2) is familiar with the applicable standard of care concerning the allegations contained in the Complaint; and (3) opined that the standard of care was breached and the breach caused Janice severe ongoing pain and significant scarring, permanent disability, permanent significant functional limitations and physical deformity.

14.     In January, 2015, Janice, experiencing back pain radiating to her left hip and leg with some numbness in her right foot was seen by Dr. Michael W. Stevens.  Dr. Stevens prescribed an MRI spine lumbar without contrast which was performed on January 28, 2015 at Upper Valley Medical Center in Troy, Miami County, Ohio.

15.     The results of the MRI established, in significant part, that Janice had a new large right paracentral disk extrusion with superior migration of the L5–S1 level superimposed on a broad–based disc bulge, impinging on the right L5 nerve root proximal to the right neural foramen and contributing to moderate overall central stenosis. Further, the MRI established that there is probable mild impingement in the right neural foramen of the L5 nerve root and severe left foraminal narrowing causing impingement of the exiting left L5 nerve root.  Additional findings were progressive central stenosis at the L4–L5 level as well as progressive foraminal narrowing bilaterally with possible contact along the posterior margins for nerve roots from facet

4

arthropathy nueroforamina, progressive mild to moderate central stenosis at the L3–4 level as described as well as progressive mild degenerative facet arthritis at the L2–3 level.

16.     On April 2, 2015 Janice consulted with Defendant Taha at his office at 31 Stanfield Drive, Suite 104, Troy, Miami County, Ohio regarding her condition and correction thereof. On that date Defendant Taha diagnosed Janice's condition as lumbar stenosis, lumbar spondylolisthesis and lumbar disc herniation and recommended surgery to correct.

17.     Surgery was scheduled for May 24, 2015 at Defendant Kettering in Kettering, Ohio.

18.     On May 24, 2015 at Defendant Kettering, Defendant Taha attempted to perform a decompressive laminectomy with discectomy and transforminal lumbar interbody fusion at L4 through S1 with application of Capstone control PEEK cages of Medtronic for spondylolisthesis and spinal stenosis. Cages were placed between the vertebral bodies at both L4-L5 and L5-S1,

22.     On the morning of May 29, 2015 nurses at Defendant Genesis observed fluid on the bed sheets used by Janice.

23.     Janice's sister, Barbara Storms and a friend who visited on May 29, 2015 also observed the fluid on the bed sheets.

24.     The fluid came from the area of Janice's surgical incision.

25.     The fluid was significant as the nurses at Defendant Genesis believed Janice had wet her bed during the night.

26.     The nurses at Defendant Genesis attended to the fluid and covered the area with a pad.

27.     The leak Janice experienced was determined to be a cerebrospinal fluid (CSF) leak.

28.     Thereafter, on May 30, 2015, May 31, 2015, June 1, 2015, and June 2, 2015 Janice remained at Defendant Genesis and continued to experience the leak or discharge from her surgical site.

29.     Although the discharge continued as stated above, Genesis failed to timely contact Janice's primary physician, Defendant Taha until Defendant Taha's office was finally contacted on June 2, 2015.

30.     While at Defendant Genesis Janice acquired severe wound infection that resulted in severe pain, dizziness, nausea, headaches and chills and essentially immobilized Janice.

31.     Defendant Genesis had a duty to monitor Janice during her stay at Defendant Genesis and to timely notify her primary physician of changes in her condition.

32.     Upon admission and thereafter Defendant Genesis knew or should have known that Janice was experiencing a fluid or CSF leak and that the leak was a significant change in Janice's condition.

33.     Defendant Genesis breached its duty to Janice failing to timely note a significant change in Janice's condition and to timely notify her physician of the fluid/CSF leak.

34.     Defendant Genesis fell below the accepted standard of care, skill and diligence for healthcare providers and medical provider employees in Ohio and other similar communities in its care of Janice.  Specifically, Defendant Genesis failed to meet the accepted standard of care, skill and diligence and breached its duty to Janice by failing to timely care for and notify her physician of the fluid/CSF leak.

35.     As a proximate cause of the failures of Defendant Genesis set forth above Janice suffered ongoing pain, incurred a fluid/CSF leak that led to infection, pain and suffering, MRSA, sepsis and additional surgery.

6

36.     Attached hereto and provided in accordance with Ohio Civil Rule 10(D)(2)

requiring an Affidavit of Merit is the affidavit of Kathleen Meyer, DNP, GCNS, ACHPN, a

Geriatric Clinical Nurse Specialist licensed to practice nursing in the State of Ohio, who has: (1)

reviewed all relevant medical records and laboratory reports of Defendants Kettering and

Genesis, and the records of Defendant Genesis from May 28th, 2015 to June 3rd,2015, including

but not limited to nurses notes reasonably made available by Defendant Genesis concerning the

care provided to Janice by Defendant Genesis; (2) is familiar with the applicable standard of care

concerning the allegations contained in the First Amended Complaint; and (3) opined that the

standard of care was breached and the breach caused Janice severe ongoing pain and suffering

and MRSA , leading to additional surgery.

38.     On June 3, 2015 Janice was transferred to Defendant Kettering with severe wound

infection and sepsis.

39.     An MRI was completed on June 3, 2015 indicating that the cage at L5-S1 had

migrated posteriorly.

40.     On June 4, 2015 Defendant Taha performed an urgent exploration and

debridement of Janice's lumbar wound and at the time of the second surgery she required another

repair of the dura matter for recurrent CSF leak.

42.     Although Defendant Taha knew or should have known of the migrating cage,

Defendant made no mention of this complication to Janice and failed to advise Janice of the

option of removing or correcting the malpositioned cage.

43.     Following the surgery of June 4, 2015 Janice's symptoms are right thigh pain and

numbness with continued intractable back pain.

7

44.     From June 6, 2015 through June 10, 2015 Janice's pain continued and she attempted to reach Defendant Taha for care and treatment and his counsel. The pain was so great and all-encompassing that Janice was required to lie on her back to get any relief.

45.     Janice was unable to reach Defendant Taha. Defendant Taha did not visit Janice at the hospital or the rehabilitation center and he was unavailable at his offices.

46.     Another MRI was performed on June 10, 2015 as a result of ongoing pain. This was followed by a CT scan of the lumbar spine on June 17, 2015 and another MRI of the lumbar spine which was performed on June 22, 2015 as a result of ongoing unremitting pain.

47.     The MRI of June 10, 2015 revealed further migration of the intervertebral cage at L5-S1 toward the spinal canal.

48.     Although Defendant Taha knew or should have known of the worsening migration of the cage toward Janice's spinal canal, Defendant Taha did not disclose this condition to Janice and Defendant Taha failed to take any action to correct this worsening situation.

49.     Janice was discharged from Defendant Kettering on June 13, 2015 without resolution of the infection or wound drainage and pain. Defendant Taha did not participate in the discharge.

50.     Janice was transferred to Koester Pavillion ("Koester") in Troy, Miami County, Ohio on a stretcher and admitted on June 13, 2015.

51.     On admission Janice was diagnosed with blood infection (mersa), wound infection, leukocytosis and was treated intravenously through a picc line.

52.     Janice remained at Koester until June 20, 2016 all the while in extreme pain with wound infection and wound drainage.

8

53.     Numerous attempts were made during this time to reach Defendant Taha without success.

54.     Drainage and infection continued until Janice could no longer stand the pain at which time on June 20, 2015 she was transferred by squad to Defendant Kettering.

55.     Janice was admitted to Defendant Kettering with recurrent wound drainage and infection.

56.     Dr. Catherine Bacheller, an infectious disease specialist was provided to Janice by Defendant Kettering who on June 21, 2015 suggested further care and treatment after Defendant Taha had input.

57.     On June 23, 2015 another MRI was performed revealing cage retropulsion at L5-S1 migrating into the spinal canal compromising the L5 nerve root.

58.     Defendant Taha and Defendant Kettering took no action regarding the malpositioned cage and did not make Janice aware of this problem.

59.     During her hospital course at Defendant Kettering Janice experienced recurrent fluid accumulation from the surgical site, bacteremia with MRSA, lower extremity edema, secondary to hypoalbuminemia and extreme pain.

60.     Janice was discharged from Defendant Kettering on June 26, 2015 and transported back to Koester.

61.     During her hospital stay from June 21, 2015 to June 26, 2015 Defendant Taha did not see Janice and did not provide any care or treatment.

62.     Janice remained at Koester with no improvement and was released to the home of her friend Suzanne Kresse in Troy, Ohio on June 30, 2015 with home health care.

63.     Janice's condition continued to deteriorate and her friend was unable to care for her; she was readmitted to Koester on July 6, 2015.

64.     On July 8, 2015 Janice kept an appointment with Defendant Taha that had been scheduled at the time of her second surgery of June 4, 2015.

65.     Janice presented to Defendant Taha's office very concerned about her condition and with severe left hip pain and continuing on high does pain medications.

66.     Defendant Taha failed to show up for the July 8, 2015 appointment.

67.     On July 15, 2015 Janice kept another appointment with Defendant Taha at his office at Defendant Kettering. Janice was lethargic and unable to communicate experiencing severe and persistent bilateral hip, buttock and back pain.

68.     Defendant Taha was unable to express an opinion of the cause of Janice's pain but stated the cage was displaced and he would evaluate and investigate further with a CT scan. Defendant Taha made an appointment with Janice for July 22, 2015 to discuss his findings.

69.     On July 17, 2015 Janice's condition deteriorated to the point that in addition to severe back pain she was lethargic, confused and exhibited altered mental state. She was transported as an emergency patient to Upper Valley Medical Center in Troy, Ohio and was admitted.

70.     The CT scan of the lumbar spine performed on June 17, 2015 clearly demonstrated the L5-S1 intervertebral cage repulsion into the spinal canal.

71.     The studies also reveal increased signal within the L5 vertebral body on T2 weighted imaging studies and T2 fat suppression imaging sequences demonstrating concern over edema and possible fracturing of the L5 vertebral body, in addition to the cage position findings.

10

72.     Because she was hospitalized Janice was unable to keep her July 22, 2015 appointment with Defendant Taha. However, two of Janice's friends, concerned about Janice's condition, kept the appointment for her in the hope of finding out the source of the problem and what could be done to correct the problem.

73.     Defendant Taha told Janice's friends that he is unable to determine the source of the problem because he did not have the MRI and CT scan films. Defendant Taha chastised Janice's friends for failing to obtain the films and bring them to Defendant Taha.

74.     The MRI of June 22, 2015 revealed even worse cage retropulsion at L5-S1 with migration into Janice's spinal canal.

75.     Defendant Taha did not see Janice again. Defendant Taha did not visit Janice in the hospital, he provided no care or treatment of any kind.

76.     Abandon by Defendant Taha and unable to care for herself Janice made the decision to find a surgeon in Phoenix, Arizona where her sister and brother live so that she could have help with everyday activities.

77.     Because of the back pain Janice was required to lie on her back to get any semblance of relief from the pain and, therefore, she could not travel by automobile or commercial aircraft. Janice made arrangements to be flown to Arizona by Angel Medflight, a commercial hospital in the air, at a cost of $22,400.

78.     In Phoenix, Arizona Janice obtained the services of Dr. Mark Wang, a spinal surgeon to perform revision surgery.

79.     Dr. Wang advised Janice that he would attempt to revise the surgery attempted by Defendant Taha, hoping to remove the cage that had migrated into Janice's spinal canal and properly fuse the vertebra.

11

80. Dr. Wang operated on September 22, 2015 and found failed arthrodesis at L5-S1 with loose left L5 and S1 pedicle screws and an interbody cage at L5-S1 that had posteriorly migrated into the spinal canal.

81. Unfortunately, Dr. Wang further found that the cage or interbody implant that had extruded from L5-S1 was significantly tethered to the anterior dural sac and could not be removed due to significant risk to the cauda aquina and paralysis.

82. As a direct and proximate cause of the delay in treatment caused by Defendant Taha, Defendant Kettering, and Defendant Genesis the die was cast and Janice must live permanently with the malpositioned cage tethered to her anterior dural sac and cannot be removed due to risk to the cauda aquina and paralysis.

83. In order to endure her condition and ambulate Janice must use a wheel-chair, walker or possibly a cane for stability. Janice is required to take opiates for pain on a daily basis to make the pain bearable.

## CAUSES OF ACTION AGAINST DEFENDANT TAHA
## NEGLIGENCE

84. Defendant Taha, individually or by and through actual or ostensible agents or employees owed Janice the duty to exercise the degree of skill, care, and diligence required of reasonably skillful and prudent physicians, specialists, and/or other healthcare professionals under similar circumstances.

85. Defendant Taha, individually or by and through actual or ostensible agents and employees breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent healthcare provider would have exercised under same or similar circumstances through, among other things: (a) failing to provide Janice with timely and

12

aggressive medical attention, and failing to recommend and provide surgical revision of the malpositioned fusion cage; and (b) abandoning Janice after June 6, 2015 and failing to provide any further medical care and treatment.

86.     As a direct and proximate result of Defendant Taha's negligence, Janice has suffered severe and permanent injuries, including but not limited to on-going pain, significant scarring, permanent disability, permanent significant functional limitations, physical deformity and loss of enjoyment of life.  These injuries have caused her to incur medical, hospital, physical aids, and drug expenses, and due to the permanent nature of her injuries will cause her to incur these expenses into the future.

**INFORMED CONSENT**

87.     Prior to surgery, Defendant Taha asked Janice to sign an informed consent form prepared by Defendants Taha and Kettering.

88.     Defendants Taha and Kettering failed to fully inform Janice of the risks inherent in the management and treatment plan pursued by them and/or failed to advise Janice of accepted medical treatment alternatives and, therefore, failed to obtain her informed consent.

89.     Defendants failed to inform Janice that Defendant Taha would be unavailable to care and treat her post-surgery as he would be unavailable and could not be reached.

90.     Defendant Taha further failed to inform Janice that he would be using Capstone control PEEK cages of Medtronic to facilitate a Left L4-L5 and L5-S1 transforaminal interbody fusion or that said cages may migrate and the risks associated with those cages.

91.     Had Janice been fully and properly informed of the risks inherent in the management and treatment plan pursued by Defendants Taha and Kettering and/or advised by

13

them of accepted medical treatment alternatives, she would not have consented to the management and treatment plan pursued by Defendant Taha and Defendant Kettering.

92.     As a direct and proximate result of the failure of Defendants Taha and Kettering to obtain informed consent, Janice was injured due to the risks inherent in the Defendants' management and treatment plan.

## BATTERY

93.     Defendant Taha and Defendant Kettering committed battery against Janice by performing medical procedures for which they did not properly obtain informed consent, including but not limited to: (a) failing to inform Janice of the risks inherent in the management and treatment plan pursued by them and/or failed to advise Janice of accepted medical treatment alternatives and, therefore, failed to obtain her informed consent; (b) failing to inform Janice that Defendant Taha would not be available to treat her post-surgery as he would be unavailable and could not be reached; (c) failing to inform Janice that she would have to rely on "hospitalists" after surgery and that critical care decisions could not be made without the input of Defendant Taha; (d)  failed to inform Janice that Defendant Taha would be using Capstone control PEEK cages of Medtronic to facilitate a Left L4– L5 and L5– S1 transforaminal interbody body fusion or that said cages may migrate and the risks associated with these cages.

94.     Had Janice been fully and properly informed of the risks inherent in the management and treatment plan pursued by Defendants Taha and Kettering and/or advised by them of accepted medical treatment alternatives, she would not have consented to the management and treatment plan pursued by Defendants Taha and Kettering.

95.     As a direct and proximate result of the aforementioned battery by Defendants Taha and Kettering, Janice was caused to sustained severe and grievous injuries, prolonged pain

and suffering, emotional distress, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities, and has incurred and will continue to incurred substantial medical expenses and treatment.

## FRAUDULENT CONCEALMENT

96.     Defendant Taha, individually and/or through his actual or ostensible agents or employees, made material, false representations and/or concealed material facts during and in the course of his care and treatment of Janice. Such false representations include, but are not limited to: (1) improper information regarding the particular procedures to be performed; (2) concealment of the fact that Defendant Taha would be unavailable to care for Janice post-surgery; (3) failure to disclose that Defendant Taha had nicked Janice during the first surgery of May 24, 2015 in two places; (4) failure to disclose that Janice experienced significant CSF leak as a result of Defendant Taha's failure to close the second wound to the dura; (5) failure to disclose the fact that Defendant Taha knew the cage at L5-S1 had migrated posteriorly; (6) failure to disclose the fact that Defendant Taha knew on June 3, 2015 prior to the second surgery of June 4, 2015 that the cage at L5-S1 had migrated posteriorly and was malpositioned; (7) failure to disclose the fact that an MRI of June 10, 2015 disclosed that the cage at L5-S1 had migrate posteriorly and was malpositioned; (8) failure to disclose the fact that an MRI of June 22, 2015 disclosed that the cage at L5-S1 had migrated posteriorly into Janice's spinal canal.

97.     Defendant Taha had a duty to disclose to Janice the afore-mentioned facts as these facts had a direct bearing on and were material to Janice's current and future care and treatment.

98.     The concealed or misleading facts, as stated above, were made by Defendant Taha falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether said concealed or misleading facts were true or false that knowledge can be inferred and

Defendant Taha made said misrepresentations and concealments with the intent of causing Janice to rely on them. Janice was justified in relying on the representations and concealments. Janice's injuries were proximately caused by the reliance.

99.     Defendant Taha failed to provide any care and treatment after June 6, 2015 until Janice kept an appointment with Defendant Taha on July 15, 2015. Although numerous film studies were performed and available, Defendant Taha had failed to review any of the films but misled Janice into believing there was no compression of the nerve roots and that her pain was resulting solely from infection.

100.    Defendant Taha further misled Janice stating on July 15, 2015 she would not need further surgery but that Defendant Taha would investigate further with a lumbar CT scan to evaluate the displaced cage. Defendant Taha made an appointment with Janice for July 22, 2015.

101.    Janice was admitted to Upper Valley Medical Center in Troy, Miami County, Ohio as an emergency patient on July 17, 2015, comatose, with a change in mental capacity and in intractable pain only able to lie on her back.

102.    Unable to keep her appointment on July 22, 2015 two friends of Janice kept the appointment with Defendant Taha going to Defendant's office at Defendant Kettering in the hope of obtaining information regarding Janice's problems and how they could be solved.

103.    At the meeting of July 22, 2015 Defendant Taha admitted he was unaware of the fact that Janice was a patient at Upper Valley Medical Center. Although a CT scan had been performed on July 17, 2015 at Upper Valley Medical Center, Defendant Taha admitted that he had failed to look at any of the images. Defendant Taha stated he had no recommendations for further treatment and then Defendant Taha criticized Janice's friends for failing to go to Upper Valley Medical Center, obtain the films and bring them to Defendant Taha's office.

16

104.    Defendant Taha knew or should have known, in light of the circumstances, that his conduct in abandoning Janice, failing to provide follow-up care and treatment, and misleading Janice resulting in delay in treatment of the malpositioned cage would naturally and probably result in injury and damage and that Defendant Taha continued this conduct with malice or in reckless disregard of the consequences, from which malice may be inferred.

105.    After the surgeries of May 24, 2015 and June 4, 2015 Janice continued to rely on Defendants Taha and Kettering for care and treatment.

**SPOLIATION**

106.    Janice restates the allegations contained in paragraphs one through 105 herein as though fully rewritten herein.

107.    What occurred on July 22, 2015 has become a contested issue in this case.

108.    There are three documents at issue regarding the events of July 22, 2015.

109.    `Two of the documents are included in the Office File of Defendant Taha.

110.    The third and "original" document has been destroyed by Defendant Taha.

111.    The Progress Note dated 8/10/2015, but written on July 27, 2015 was recopied from the "original" destroyed document and includes the statement: "Original note recopied as part of another patient".

112.    The third note also dated July 22, 2015, was signed and approved by Defendant Taha on July 30, 2015, three days after Defendant Taha allegedly made the July 27, 2015 redraft from the "original".

113.    On February 8, 2017 Janice served her Second Request for Production of Documents to Defendant Taha requesting the following:

17

>Document Request No. 1: please produce the "the original note recopied
>
>as put on another patient" as stated in the Advanced Neurosurgery, Inc.
>
>Progress Note for Janice Weadock dated August 10, 2015."

114.    On March 22, 2017 Defendant Taha responded to Janice's Second Request but
failed to produce the "original note" and stated that it was destroyed.

115.    Defendant Taha has willfully destroyed his "Original note".

116.    Taha's destruction of the "original note" is designed by Defendant Taha to
produce a defense that he was told by Janice's friends on July 22, 2015 to take no further action
in treating or caring for Janice until he received further advice from Janice's friends, a deliberate
deception designed to disrupt Janice's case herein.

117.    Defendant Taha was aware of this litigation when he destroyed the original note.

118.    Janice was damaged by Defendant Taha's deliberate disruption of Janice's case
herein for which she is entitled to punitive as well as compensatory damages.

## CAUSES OF ACTION AGAINST DEFENDANT GENESIS

119.    Janice restates the allegations contained in paragraphs one through 105 herein as
though wholly rewritten herein.

120.    Defendant Genesis breached its duty to Janice and was negligent by failing to
properly monitor her condition and, in particular, failing to care for and timely notify her primary
physician of a fluid/CSF leak.

121.    As a direct and proximate result of the failure of Defendant Genesis to fulfill its
duty to Janice, she developed infection and sepsis resulting in further surgery and complications,
on-going pain and suffering, significant scarring, permanent disability, permanent significant

18

functional limitations and physical deformity, loss of enjoyment of life, medical, hospital, drug expenses now and into the future.

## CAUSES OF ACTION AGAINST DEFENDANT KETTERING

122.    Defendant Kettering owed their patient, Janice, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent healthcare provider would have exercised under like or similar circumstances.

123.    Defendant Kettering acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent healthcare provider would have exercised under same or similar circumstances through, among other things, improper assistance during Janice's surgeries and improper follow-up treatment and care.

124.    Defendant Kettering, its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors, including Defendant Taha, are liable to Janice pursuant to the doctrine of respondeat superior for the torts of its employees and/or agents.

125.    Defendant Kettering, its agents, employees, representatives, nurses, residents, doctors, and outside physicians, contractors or subcontractors, including Defendant Taha, are liable to Janice pursuant to the doctrine of agency by estoppel.

126.    Defendant Kettering is liable for the negligence of its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors and physicians who are not its employees by virtue of Defendant Kettering holding itself out to the public as being a provider of medical services, and Janice had no knowledge, actual or implied, to the contrary, and Janice relied upon the representation, advertising, and publicity offered by Defendant

Kettering that the hospital would provide competent care but which representations were not true.

127.    Defendant Kettering is estopped from claiming its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors, the physicians and, specifically, Defendant Taha is an independent contractor and said Defendant Kettering is estopped from asserting that other Defendants are responsible for Janice's injuries as a defense.

## MEDICARE

128.    A portion of Janice's medical expenses have been paid by Medicare.  The exact amount of these payments is unknown to Janice.

129.    This action is filed against Medicare in order to provide Medicare notice and the opportunity to set out its claim or claims, if any, against the Defendants in this action.

## JANICE'S DAMAGES

130.    As a direct and proximate result of the joint and several conduct of Defendant Taha, Defendant Kettering and Defendant Genesis herein, Janice has suffered severe and permanent injuries as described above. These injuries have caused her to incur medical, hospital, and drug expenses and, due to the permanent nature of the injuries will cause her to incur medical, hospital and drug expenses in the future.

131.    As a further direct and proximate result of the joint and several conduct of Defendant Taha, Defendant Kettering, and Defendant Genesis Janice has suffered severe pain, mental anguish, loss of enjoyment of life, and permanent loss of earning capacity, and due to the permanent nature of the injuries will continue to suffer from severe pain, mental anguish, loss of enjoyment of life, and loss of income in the future.

132.    In addition to the above stated damages for which Janice is entitled to compensation, Janice prays for punitive damages.

WHEREFORE, Plaintiff individually demands judgment as follows:

1.    Against Defendant Taha, Defendant Kettering, and Defendant Genesis, jointly and severally, in excess of $25,000, plus attorney fees, costs of this action, and punitive damages, and for any and all other relief Plaintiff may be entitled at law or equity.

2.    Plaintiff demands that Medicare set forth its claims, if any, for reimbursement of Medicare payments made on behalf of Janice and for which Defendant Taha, Defendant Kettering and/or Defendant Genesis may be liable.

Respectfully submitted,

By _____

Alfred J. Weisbrod # 0031240
WEISBROD LAW OFFICE
P.O. Box 513
Dayton, OH 45409-0513
Telephone: (937) 443-9999
Facsimile:  (937) 443-9890
Email: alweisbrod@aol.com
*Attorney for Plaintiff, Janice L. Weadock*

### JURY DEMAND

Plaintiff demands a trial by jury.

_____

Alfred J. Weisbrod  (0031240)

21

## CERTIFICATION

I hereby certify that a copy of the foregoing Second Amended Complaint Jury

Demand Endorsed Hereon has been served by Certified U.S. Mail/or electronically on June 21,

2017 to the following:

Patrick K. Adkinson, Esq.
Poling Law
4244 Indian Ripple Rd., Suite 150
Dayton, OH 45440
patkinson@poling-law.com
Attorney for Defendant, Jamal Taha

Medicare, Benefits Coordination
and Recovery Center
P.O. Box 138897
Oklahoma City, OK 73113

Alfred J. Weisbrod

22

## AFFIDAVIT

Robert K. Eastlack M.D. being duly sworn according to law states as follows:

1.   Affiant is a medical doctor licensed to practice medicine in the State of California;

2.   Affiant specializes in orthopedic spinal surgery;

3.   Attached to this affidavit is affiant's curriculum vitae;

4.   Affiant has reviewed all of the medical records, laboratory reports, imaging studies, reports and films reasonably available concerning the care and treatment provided to Janice L. Weadock by Dr. Jamal Taha and Kettering Hospital regarding Ms. Weadock's surgery of May 24, 2015 and thereafter;

5.   Affiant has also reviewed the medical records, laboratory reports, imaging studies, reports and films from Upper Valley Medical Center concerning diagnosis of Ms. Weadock's spondylolisthesis and spinal stenosis and thereafter;

6.   Affiant, is an orthopedic spinal surgeon and is familiar with the applicable standard of care for surgery of the type performed by Dr. Jamal Taha on Ms. Weadock;

7.   The medical records of Ms. Weadock establish that on May 24, 2015 Dr. Taha attempted an L4 through S1 transforaminal lumbar interbody fusion for spondylolisthesis and spinal stenosis. In the course of Ms. Weadock's procedure she experienced a cerebrospinal fluid leak. Cages were placed between the vertebral bodies at both L4–5 and L5–S1, along with cortical screws and rods for fixation. Subsequent to that procedure, Ms. Weadock presented to Dr. Taha with continued pain and wound drainage. An MRI was completed on June 3, 2015 indicating that the cage at L5-S1 had migrated posteriorly. On June 4, 2015, Dr.

1

Taha performed an urgent exploration and debrideman of Ms. Weadock's lumbar wound based on pursumed infection, and at the time of the second surgery she required another repair of the dura matter for a recurrent CSF leak. Ms. Weadock underwent another MRI on June 10, 2015 as a result of continued pain. This was followed by another MRI of the lumbar spine, which was performed on June 22, 2015 for ongoing unremitting pain. Based on persistent severe symptoms that included severe back and left lower extremity pain, along with an inability to access Dr. Taha for evaluation and treatment, Ms. Weadock sought care in Phoenix, Arizona for urgent evaluation and revision surgery.

New radiographs performed on July 8, 2015 revealed an L4–S1 posterior lumbar interbody fusion without arthrodesis completion at that time point and evidence of corrosion and subsidence of both cages as well as the retropulsion of the L5–S1 cage into the spinal canal. Dr. Mark Wang took over the care of Ms. Weadock, performing surgery on September 22, 2015 in an effort to revise the surgery performed by Dr. Taha in May, 2015. Dr. Wang was unable to address the intervertebral cage in its malposition as a result of severe scarring and concern that it might further injure the neutral elements.

According to the medical records provided, Ms. Weadock has unfortunately continued to suffer from significant pain that requires chronic opioid medications and which has resulted in significant functional limitations and physical deformity.

Your affiant has reviewed a multitude of imaging studies regarding Ms. Weadock's surgical care, including the operative fluoroscopy imaging studies

2

from May 24, 2015. The operative images from that date reveal appropriate positioning of all implants including the interbody cages at L4-5 and L5-S1. A postoperative MRI was undertaken on June 3, 2015 and reveals intervertebral cages at L4-5 and L5-S1, but with posterior migration of the intervertebral cage at L5-S1 when comparing the study to those images taken in the operating room.

Subsequent to the second surgery, at which time Ms. Weadock underwent an irrigation and debridement procedure, a second postoperative MRI of the lumbar spine was done on June 10, 2015 and this study reveals continued migration of the intervertebral stage at L5-S1 toward the spinal canal. The MRI from June 22, 2015 reveals even worse cage retropulsion at L5-S1 with migration into the spinal canal. Increased signal within the L5 vertebral body on T2 weighted imaging studies and T2 fat suppression imaging sequences demonstrate concern over edema and possible fracturing of the L5 vertebral body, in addition to the cage position findings. On July 17, 2015, a CT scan of the lumbar spine without contrast was performed and reveals the surgical reconstruction aforementioned and it clearly demonstrates the L5-S1 intervertebral cage repulsion into the spinal canal. There is also evidence of subsidence, osteolysis, and/or fracturing of the L5 vertebral body.

The sequence of imaging studies from Ms. Weadock's care in May, 2015 and thereafter reveals a gradual retropulsion of the intervertebral cage at L5-S1, which compromised the nerve roots within the spinal canal. This change in cage position was initially seen on the MRI of June 3, 2015, when comparing this study

3

to intraoperative imaging, and there was clear worsening on June 10 and June 22, 2015 when serially comparing the MRI studies.

Based upon my review of the medical record, including but not limited to the laboratory reports, imaging studies, reports and films as well as the above stated facts it is your affiant's opinion to a reasonable medical certainty that Dr. Taha breached the standard of care for spinal surgeons performing transforaminal interbody fusions as follows:

a.      by failing to provide Ms. Weadock with timely and aggressive medical attention in June, 2015, failing to recommend and provide surgical revision of the malpositioned cage;

b.      by abandoning Ms. Weadock after June 4, 2015 and failing to provide any further care and treatment to Ms. Weadock;

As a result of and as a proximate cause of the malpractice/breach of the standard of care by Dr. Taha, Ms. Weadock suffers severe ongoing pain and significant scarring caused by the delay resulting in an inability to revise the malpositioned cage causing an outcome that has left Ms. Weadock permanently disabled with permanent significant functional limitations and physical deformity. Further, affiant sayeth not.

_____
Robert K. Eastlack M.D.

4

STATE OF _____ )
COUNTY OF _____ )

     Sworn to before me and subscribed in my presence by the said Robert K. Eastlack, M.D.,

this _____ day of _____, 2016.

*See below CA compliant Jurat*



A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA    COUNTY OF *San Diego*

Subscribed and sworn to (or affirmed) before me on this *05* day of *May*,

20 *16* by *Robert K. Eastlack*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

*R. Mcintyre*

(Signature of Notary)

R. MCINTYRE
Commission No. 2037800
NOTARY PUBLIC – CALIFORNIA
SAN DIEGO COUNTY
Commission Expires August 19, 2017

5

## CURRICULUM VITAE
### Robert Kenneth Eastlack, MD
### Orthopaedic Surgery—Board Certified

Orthopaedic Surgeon
Scripps Clinic, Division of Orthopaedic Surgery
10666 N. Torrey Pines Road, MS116
La Jolla, CA 92037
T: (858) 554-7988; F: (858) 554-8231: C: (858) 361-1390
Email: Eastlack.Robert@scrippshealth.org

Clinical Instructor
University of California, San Diego and VA Hospital
200 W. Arbor Drive, 8894
San Diego, CA 92103-8894
T: (619) 543-5944; F: (619) 543-7510

---

## EDUCATION

| | | |
|---|---|---|
| MD | BAYLOR COLLEGE OF MEDICINE<br>Houston, Texas | 1997–1999 |
| | UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER<br>San Antonio, Texas | 1995–1997 |
| BA | Human Biology, focus in Neurophysiology/Behavioral Biology<br>STANFORD UNIVERSITY<br>Palo Alto, California | 1990–1994 |

## POSTGRADUATE EDUCATION

| | |
|---|---|
| Fellowship, Spine Surgery<br>MAYO CLINIC<br>Rochester, Minnesota | 2005–2006 |
| Residency - Orthopaedic Surgery<br>UNIVERSITY OF CALIFORNIA<br>San Diego, California | 2001–2005 |
| Research Fellowship, Department of Orthopaedic Surgery<br>UNIVERSITY OF CALIFORNIA<br>San Diego, California | 2000–2001 |
| Internship - General Surgery<br>UNIVERSITY OF CALIFORNIA<br>San Diego, California | 1999–2000 |

## AWARDS AND HONORS

| | |
|---|---|
| Named in "100 of the Best Spine Surgeons and Specialists in America", Becker Ortho | 2011 |
| Administrative Chief Resident, University of California San Diego | 2004–2005 |
| Jacqueline Perry Award, Orthopaedic Rehabilitation Association | 2003 |
| Alpha Omega Alpha Honor Society, Baylor College of Medicine Chapter, Inducted | 1998 |
| Baylor Award for Outstanding Achievement in Orthopaedic Research | 1998 |
| Southern Medical Association Scholar Award | 1997 |
| Texas Legislature Merit Scholar Award | 1997 |
| Team Captain, Stanford Men's swimming | 1993–1994 |
| Varsity member National Championship team NCAA Division I Men's Swimming | 1992 1-994 |
| Stanford Honor Athlete | 1990-1994 |
| Stanford Scholar Athlete | 1993 |
| PAC-10 All-Academic Athlete, Second Team | 1991–92 |
| Outstanding Freshman, Stanford Men's swimming | 1990–91 |

## MEMBERSHIPS

| | |
|---|---|
| Society of Lateral Access Surgeons, Board Member | 2008-present |
| American Board of Orthopaedic Surgery, Board Certified | 2008-present |
| Society for Minimally Invasive Spine Surgery, Founding Member | 2006–present |
| American Academy of Orthopaedic Surgeons | 2001–present |
| Scoliosis Research Society | 2008–present |
| AO North American Spine Society Faculty | 2009–present |
| North American Spine Society | 2005–present |
| University of California San Diego, Housestaff Association | |
| President | 2001–2005 |
| Vice-President | 2004–2005 |
| Representative | 2001–2005 |

| | |
|---|---|
| Western Orthopaedic Association | 2001–present |
| San Diego County Medical Society | 1999–present |
| California Medical Association | 1999–present |
| Longitudinal Ambulatory Care Experience Curriculum Committee Baylor College of Medicine | 1998–1999 |
| Texas Medical Association | 1996–1999 |
|     Chapter President | 1996–1997 |
|     *(Projects: Residency Fair; Charity Ball for Children with AIDS; Habitat for Humanity; Malpractice Bowl Charity Fund-raiser; Domestic Violence Speaker Series)* | |
|     Representative, Texas Medical Association | 1996–1998 |
|     Winter Leadership Conference in Austin | 1996 |
|     Annual Meetings | 1995–1997 |
| Bexar County Medical Society | 1996–1997 |
|     Council Student Representative | 1996–1997 |
| American Medical Association | 1995–2003 |
|     Co-author, Resolution for the AMA-Medical Student Section Annual Session, Atlanta | 1996 |
| American Medical Student Association | 1995–1998 |

## PUBLICATIONS

1. Eastlack R, Schenck RC, Guarducci C. The Dislocated Knee: Classification, Treatment, and Outcome. *U.S. Army Medical Department Journal.* Nov-Dec 1997, 2–9.

2. Aucar JA, Eastlack R, Wall MJ Jr, Liscum KR, Granchi TS, Mattox KL. Remote clinical assessment for acute trauma: an initial experience. *Proc AMIA Symp.* 1998:396–400.

3. White K, Flippin M, Eastlack R, Cutuk A, Groppo E, Hargens A, Pedowitz R: Effects of L-Selectin Blockade upon Skeletal Muscle Function, Edema Formation, and Leukocyte Activation Associated with Ischemia-Reperfusion Injury. *Trans 47th Orthop Research Soc.* 26:717, 2001.

4. Eastlack R, Groppo E, Hargens AR, Pedowitz R. Ischemic preconditioning ineffective in a tourniquet model. *J Orthop Res.* 22(4):918-23, 2004.

5. Eastlack R, Groppo E, White K, Steinbach G, Hargens A, Pedowitz R. Lower body positive-pressure after knee surgery. *Clin Orthop Relat Res.* (431):213–9. 2005

6. Groppo ER, Eastlack RK, Mahar A, Hargens AR, Pedowitz RA. Simulated hypergravity running increases skeletal and cardiovascular loads. *Med Sci Sports Exerc*, 37(2):262–6. 2005.

7. Macias BR, Groppo ER, Eastlack RK, Watenpaugh DE, Lee SM, Schneider SM, Boda WL, Smith SM, Cutuk A, Pedowitz RA, Meyer RS, Hargens AR. Space exercise and Earth benefits. *Curr Pharm Biotechnol*, 6(4):305–317, 2005.

8. Ward SR, Hentzen ER, Smallwood LH, Eastlack RK, Burns KA, Fithian DC, Friden J, Lieber RL. Rotator Cuff Muscle Architecture: Implications for Glenohumeral Stability. *Clin Orthop Relat Res.* (448):157–163, 2006.

9. Christensen D, Eastlack R, Lynch J, Yaszemski M, Currier B. C1 Anatomy and Dimensions Relative to Lateral Mass Screw Placement. *Spine,* 32(8):844–848, 2007.

10. Eastlack R, Dekutoski M, Bishop A, Moran S, Shin A. Vascularized Pedicled Rib Graft: A Technique for Posterior Placement in Spinal Reconstruction. *J Spinal Disord Tech.* 20(8): 610–615, 2007.

11. Santoro J, Eastlack R, Bugbee W. Impact of Erythropoietin on Allogenic Blood Exposure in Orthopedic Surgery. *Am J Orthop.* 36(11): 600–604, 2007.

12. Eastlack RK, Keeman TJ, Patel R, Huddelston PM. Infection not associated with use of human musculoskeletal tissue allografts, *Cell Tissue Bank,* 13(1):47–51, 2012.

13. Eastlack RK. Review: Emerging Technologies in Spine Surgery, *Spine J,* 7(3): 382, 2012

14. Eastlack RK, Kesman TJ, Patel R, Huddleston PM. Infection not associated with use of human musculoskeletal tissue allografts. *Cell Tissue Bank,* 13(1):47-51, 2012.

15. Akbarnia BA, Mundis GM Jr, Moazzaz P, Kabirian N, Bagheri R, Eastlack RK, Pawelek. JB.Anterior Column Realignment (ACR) For Focal Kyphotic Spinal Deformity Using a Lateral Transpsoas Approach and ALL Release. *J Spinal Disord Tech.* [Epub ahead of print], 2013.


## BOOKS AND BOOK CHAPTERS

1. Eastlack R, Bono C. Thoracolumbar trauma. Heckman J, Bucholz R, ed. *Rockwood and Green's Fractures in Adults.* 6th Edition, 2005.

2. Eastlack RK, Kauffman CP. Pyogenic Spinal Infections. Ed. Bono C, Garfin S. *Spine Surgery: Essentials of Orthopaedics.* Lippincott Williams & Wilkins.

3. Eastlack RK, Kauffman CP. Granulomatous Spinal Infections. Ed. Bono C, Garfin S. *Spine Surgery: Essentials of Orthopaedics.* Lippincott Williams & Wilkins, 2004.

4. Eastlack R, Brage M. Physical Examination of the Foot and Ankle. Ed. Bernstein J, *Musculoskeletal Medicine.* American Academy of Orthopaedic Surgeons, 2003.

5. Eastlack R, Brage M, Reider B. Lower Leg, Foot, and Ankle. Ed. Reider B, *The Orthopaedic Physical Examination.* Elsevier Saunders, 2nd Edition, 2005, pp247-296.